1

2

3

4

5

6

7

8                      IN THE UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10   EDWARD SANCHEZ, JR.,

11              Petitioner,                    No. 2:01-cv-1694 LKK KJN P

12        vs.

13   ANTHONY LaMARQUE, et al.

14              Respondents.          FINDINGS & RECOMMENDATIONS

15   _____/

16              Petitioner is a state prisoner proceeding with counsel in this habeas corpus action

17   filed pursuant to 28 U.S.C. § 2254.[1]  Petitioner challenges his 1997 conviction on charges of first

18   degree murder with use of a firearm, committed while petitioner was an accomplice in the

19   commission of robbery and commercial burglary (the burglary special circumstance was vacated

20   on appeal).  Plaintiff was sentenced to life without the possibility of parole, plus 18 years, 8

21   months.  Petitioner raises twelve claims in his Third Amended Petition, filed April 14, 2006, in

22   support of petitioner's contention that his conviction violates the Constitution.

23   ////

24

25        [1]  This action is referred to a United States Magistrate Judge pursuant to 28 U.S.C.
     § 636(b)(1)(B), Local General Order No. 262, and E.D. Cal. L.R. ("Local Rule") 302.  This case
26   was reassigned to the undersigned Magistrate Judge on February 9, 2010.

After review of the entire record, including the third amended petition, answer and reply, and for the reasons set forth below, the undersigned recommends that the petition be denied.

BACKGROUND

I.  Procedural History

1.  Petitioner appealed his conviction.  On September 29, 1999, the California Court of Appeal, Third Appellate District, affirmed the conviction in all but one respect in a reasoned opinion.  (Respondents' Lodged Document ("LD") 12.)  The Court of Appeal vacated and remanded the Day's Market burglary conviction (and sentence thereon) and the burglary special circumstance.  (LD 12 at 22-23.)

2.  On November 1, 1999, petitioner filed a petition for review in the California Supreme Court.  (LD 13.)  The California Supreme Court denied the petition on January 13, 2000.  (LD 13.)

3.  On February 13, 2001, petitioner filed his first state petition for a writ of habeas corpus in the California Supreme Court.  (LD 14.)  The court denied the petition in a one-line order on June 27, 2001.  (LD 14.)

4.  On March 4, 2002, petitioner proceeding without counsel filed the original petition in this court.  (Dkt. No. 8.)  Petitioner raised two claims of ineffective assistance of counsel, a claim of juror misconduct, and a claim of prosecutorial misconduct.  On September 5, 2002, respondents filed a motion to dismiss the petition.  (Dkt. No. 15.)  On September 4, 2003, this court dismissed the petition with leave to amend.  (Dkt. No. 22.)

5.  On September 16, 2003, petitioner filed an amended petition for writ of habeas corpus herein.  (Dkt. No. 24.)  On October 6, 2003, petitioner moved to stay these proceedings to permit him to exhaust his state court remedies.  (Dkt. No. 26.)   On November 6, 2003, this court granted petitioner's motion and ordered these proceedings held in abeyance.  (Dkt. No. 27.)

6.  On January 27, 2003, petitioner filed a petition for writ of habeas corpus in the

2

1   Sacramento County Superior Court.  (LD 15.)  The Superior Court denied the petition on

2   procedural grounds and on the merits.  (LD 15.)   Petitioner then filed habeas petitions in the

3   Court of Appeal and California Supreme Court.  (LD 16, 17.)  Those petitions were denied as

4   well.  (Id.)

5           7.  On September 8, 2005, petitioner notified this court that the California

6   Supreme Court had ruled on his state habeas petition.  (Dkt. No. 38.)  On September 16, 2005,

7   petitioner moved for appointment of counsel.  (Dkt. No. 39.)   On September 28, 2005, this court

8   lifted the stay of these proceedings and on October 27 denied petitioner's motion for appointment

9   of counsel.  (Dkt. Nos. 40, 44.)

10          8.  On April 14, 2006, petitioner, now proceeding with counsel, filed a third

11  amended petition herein.  (Dkt. No. 58.)  Respondent filed an answer on August 14, 2006.  (Dkt.

12  No. 63.)  On February 8, 2007, petitioner filed a reply.  (Dkt. No. 72.)

13  II.  Facts[2]

14          Early on a January evening in 1994, a clerk was on duty at
    Day's Market with a co-worker.  A teenage Latino entered the
15  store, walked directly to the beer cooler, selected two 12-packs,
    then bolted out of the store.  The co-worker ran after the shoplifter.
16  As the clerk went to join in the chase, his co-worker came
    staggering back, holding his hand over his chest, and warned the
17  clerk, "He's got a gun."'  The clerk ran out of the store and saw the
    shoplifter sitting in a car.  Another person was getting into the car.
18  This person turned and pointed a gun at the clerk.  He heard a shot,
    at which point he fled back into the store.  He discovered his co-
19  worker had been shot, and summoned emergency personnel.
    While he waited for the police and the ambulance, he went outside
20  and found the beer on the ground about 10 feet from the door.  The
    co-worker died, a bullet having perforated his heart.
21
            The owner of the La Tiendita grocery was also working in
22  his store on that evening.  Two young Latinos came in and went
    directly to the beer cooler, selecting two 12-packs.  They walked
23  out the front door, one of them saying, "'No money.  We don't
    pay.'"  The owner followed them outside, and saw them get into
24  the back seat of a car.  When he began to walk behind the car to see

25  _____

26      [2]  The facts are taken from the opinion of the California Court of Appeal in People v.
    Sanchez, No. C026676 (September 29, 1999).  (LD 12.)

                                          3

the license plate, the front seat passenger stepped out of the car and fired a gun at him.  The owner ducked behind a pillar.  He later found a bullet near where he had been standing.

On the night of the shooting, the defendant's mother recalled the defendant came home with Gabriel Garcia, Joshua Ortega, and Eliazer Ibarrola.  They had two 12-packs of beer.  She told them that was too much beer for them to drink, so she took one and put it in the refrigerator in the kitchen.  She went to her room, and they went into the garage to drink.  On the day after the shooting, Garcia's older brother told the defendant's mother he had seen his brother in a videotape on television in connection with the Day's Market robbery/homicide.  That afternoon, defendant called his mother and asked her to pick him up at a south area apartment.  As they drove home, she repeated what the brother told her.  The defendant kept saying, "All I can tell you, we're all in trouble."  He mentioned Garcia had taken some beer and "shots were fired."  He wondered aloud how "a little gun . . . a .22" could kill someone.  The defendant packed some things and asked his mother to drive him to an apartment somewhere in the north part of the county.

The police arrested the defendant at an apartment in Roseville.  He was hiding in the cabinets under the kitchen sink.  After they took him into custody, he waived his <u>Miranda</u> privileges and gave a statement.  (The jury saw a videotape of the statement and a transcripts of the videotape was an exhibit.)

During his statement, the defendant said he had been driving around with Garcia and co-defendants Ortega and Ibarrola.  Garcia showed them a gun; the defendant did not know where he had obtained it, and thought it might have belonged to one of the other two in the car.  The defendant announced he wanted to take someone's money.  Garcia said he wanted beer.  Garcia directed them to Day's Market.  When Garcia and the defendant got out of the car, Garcia took off after two pedestrians, but apparently they did not have any money.  Garcia handed him the gun.  He told the defendant to go and steal some beer from the market.  The defendant said he did not want any beer.  Garcia went into the store.  The defendant walked back to the car.  Garcia came running out with the beer and jumped in the car.  Someone was running after him.  Garcia told the defendant to shoot.  The defendant fired at the clerk as the four drove away.  At the second store, co-defendant Ibarrola was reluctant to go in with Garcia because his family shopped there.  He told the defendant to shoot only into the air.  The defendant fired at the store's owner because he thought the latter was reaching for a gun.  As they left, he handed the gun to co-defendant Ibarrola, who put it in the trunk through a hatch in the back seat.  On the following morning, co-defendant Ibarrola's girlfriend called the defendant to tell him the police had arrested the other two.  The defendant went with Garcia to the home of Garcia's cousin.  Garcia then left with his brother; the defendant

4

thought Garcia was going to fly to Los Angeles or Mexico.  He
called his mother and asked her to pick him up.  She later dropped
him off at a friend's house.  The defendant did not surrender after
the shootings because "I knew I was gonna get really fucked."

(LD 12 at 3-5.)

[A] jury rejected the defendant's plea of legal insanity,[3]
finding him guilty of first degree murder, attempted first degree
murder, robbery, and burglary in connection with events at Day's
Market, and attempted murder, robbery, and burglary for events at
La Tiendita market.  It sustained separate allegations that the Day's
Market murder occurred during the commission of both a robbery
and a burglary.  (Pen. Code, §§ 187-189, 190.2, 211, 459, 664,
12022.)  The court imposed a determinate prison term and a
consecutive indeterminate parole-ineligible life term.

(LD 12 at 1.)

ANALYSIS

I. <u>Standards for a Writ of Habeas Corpus</u>

An application for a writ of habeas corpus by a person in custody under a

judgment of a state court can be granted only for violations of the Constitution or laws of the

United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the

interpretation or application of state law.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991);

<u>Park v. California</u>, 202 F.3d 1146, 1149 (9th Cir. 2000).

Federal habeas corpus relief is not available for any claim decided on the merits in

state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
State court proceeding.

---

[3] The insanity defense was tried along with the guilt phase.  (LD 1, Volume 4 of the
Clerk's Transcript ("CT 4") at 884-90.)  Since all volumes of the Clerk's Transcript are identified
as Lodged Document 1, citations to the Clerk's Transcript will be identified by "CT" and the
corresponding transcript volume and page numbers.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). If there is no reasoned decision, "and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington, 131 S. Ct. at 784-85. That presumption may be overcome by a showing that "there is reason to think some other explanation for the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

6

1    Where the state court reaches a decision on the merits but provides no reasoning

2    to support its conclusion, the federal court conducts an independent review of the record.

3    "Independent review of the record is not de novo review of the constitutional issue, but rather,

4    the only method by which we can determine whether a silent state court decision is objectively

5    unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned

6    decision is available, the habeas petitioner has the burden of "showing there was no reasonable

7    basis for the state court to deny relief." Harrington, 131 S. Ct. at 784.  "[A] habeas court must

8    determine what arguments or theories supported or, . . . could have supported, the state court's

9    decision; and then it must ask whether it is possible fairminded jurists could disagree that those

10   arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at

11   786.

12   II.  Petitioner's Claims

13        A.  Alleged Ineffective Assistance of Trial Counsel

14             Petitioner alleges ineffective assistance of counsel for: (1) failing to adequately

15   raise the issue of juror misconduct in a new trial motion (Ground One); (2) failing to

16   appropriately argue the insanity defense (Ground Two); (3) failing to ask the trial court to

17   admonish the jury regarding statements made by the prosecutor and an expert witness (Ground

18   Three); (4) failing to adequately investigate and present mental defenses (Ground Eleven); and

19   (5) failing to present and argue evidence that a third party admitted the shooting (Ground

20   Twelve).  (Dkt. No. 58, attachment 12.)   For the reasons discussed below, the undersigned

21   recommends petitioner's claims of ineffective assistance of counsel be denied.

22        1.  Legal Standards

23             The Sixth Amendment guarantees the effective assistance of counsel.  The United

24   States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

25   Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

26   counsel, a petitioner must first show that, considering all the circumstances, counsel's

7

1    performance fell below an objective standard of reasonableness.  Id. at 687-88.  After a petitioner

2    identifies the acts or omissions that are alleged not to have been the result of reasonable

3    professional judgment, the court must determine whether, in light of all the circumstances, the

4    identified acts or omissions were outside the wide range of professionally competent assistance.

5    Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  Second, a petitioner must establish that

6    he was prejudiced by counsel's deficient performance.  Strickland, 466 U.S. at 693-94.  Prejudice

7    is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

8    result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a

9    probability sufficient to undermine confidence in the outcome."  Id.  See also Williams, 529 U.S.

10    at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).

11           The Supreme Court has emphasized the importance of giving deference to trial

12    counsel's decisions, especially in the AEDPA context:

13           In Strickland we said that "[j]udicial scrutiny of a counsel's
             performance must be highly deferential" and that "every effort
14           [must] be made to eliminate the distorting effects of hindsight, to
             reconstruct the circumstances of counsel's challenged conduct, and
15           to evaluate the conduct from counsel's perspective at the time."
             466 U.S. at 689.  Thus, even when a court is presented with an
16           ineffective-assistance claim not subject to § 2254(d)(1) deference,
             a [petitioner] must overcome the "presumption that, under the
17           circumstances, the challenged action 'might be considered sound
             trial strategy.'"
18
             For [petitioner] to succeed, however, he must do more than show
19           that he would have satisfied Strickland's test if his claim were
             being analyzed in the first instance, because under § 2254(d)(1), it
20           is not enough to convince a federal habeas court that, in its
             independent judgment, the state-court decision applied Strickland
21           incorrectly.  Rather, he must show that the [state]Court of Appeals
             applied Strickland to the facts of his case in an objectively
22           unreasonable manner.

23    Bell v. Cone, 535 U.S. 685, 698-99 (2002) (internal citations omitted).

24                  2.  Failure to Adequately Raise Juror Misconduct Issues (Ground One)

25           Petitioner first argues his trial counsel failed to adequately raise issues of juror

26    misconduct during the hearing on his motion for a new trial.  (Dkt. No. 58, attachment 12 at 1-2.)

Petitioner bases his claim on the following facts.  After the verdict was rendered, Juror Number 12 ("Juror H") contacted defense counsel.  (CT 4 at 905.)  According to a declaration Juror H submitted in connection with the defendant's motion for a new trial, Juror H felt that things that occurred during deliberations led to an unfair verdict regarding petitioner's sanity.  (Id. at 907.) She expressed concern that "[d]uring the whole of the deliberation on the insanity question there it seemed that the most important issue was not whether or not Mr. Sanchez was insane, but if he was found to be insane, he would be back on the street very soon."  (Id.)  As explained by Juror H:

> This was finally verbalized on the last day of deliberation.  Even though the jurors knew that it was improper to discuss this issue, it was more important that Mr. Sanchez remain in jail for a long period of time. [S]omehow during the deliberations, it became [the] opinion of the jury that if he was found insane he would be on the streets in five years.  I changed my vote from not guilty because he is "insane" to "sane" because I believed that he would be on the streets within five years.  I found out later that this is not necessarily true.

(Id.)  Juror H raised one additional issue regarding the jury's conduct:

> Lastly, it was my understanding that the jury was not supposed to deliberate except when we were all in the jury room.  One of the jurors was deliberating at home and prepared a chart that was shown to other members during the deliberations.  It was used to prove I was violating the law by not voting that Mr. Sanchez was sane.

(Id. at 907-08.)

Trial counsel incorporated this declaration of Juror H in petitioner's motion for a new trial, where he argued in pertinent part:

> 3) Prior to trial a defense Motion in Limine was granted wherein it was ordered that the People were not permitted to place before the jury the fact that Drs. Schafer and Leek were appointed by the court.  The defendant made the motion because it was felt that the probative value of the evidence was outweighed by it's (sic) prejudicial effect.
>
> 4) When Dr. Schafer testified one of the first questions asked by the People violated the court's order in Limine.  The

1          defense objected and the objection was sustained.

2                    5) When Dr. Leek testified, he testified that he was
           "..appointed by the court. . .".  The People did not inform him of
3          the court's order nor instruct him to not volunteer the information.

4                    6) Shortly after the trial concluded, my office was contacted
           by Juror Number "12".  She expressed some serious reservations
5          about the deliberations and the verdicts . . . . See her declaration
           attached as Exhibit "A" . . .
6
                     7) Her concerns were many, but there were three which . . .
7          rise to the level that would require a new trial.  The First concern is
           that one of the jurors prepared charts outside the jury deliberations
8          which were then used to persuade some jurors to vote against
           finding the defendant insane at the time of the commission of the
9          crime.  The Second concern is the allegation that if the defendant
           was found to be insane, he would be out of custody within five
10         years.  The Third concern is the violation of the Motion in Limine
           as outlined above.  It is interesting to note that with reference to
11         Dr. Schafer, even though there was no answer to the question that
           was put to him about appointment, the effect of asking the question
12         was that in the minds of the jurors the sustained objection was
           irrelevant.  They got the message.   Dr. Schafer was "Court
13         Appointed".

14  (Id. at 904-05.)

15         Petitioner contends that trial counsel erred by failing to raise the issues of juror

16  misconduct at the argument on the motion for new trial.  (See RT at 1395-1402.[4])  Argument on

17  the motion for a new trial was very brief.  The court first asked the district attorney for his

18  position.  (RT 1395.)  The district attorney stated:  (1) the court could not consider the juror's

19  declaration based on California Evidence Code § 1150's limitation on admissible evidence

20  regarding jury deliberations; (2) the declaration did not demonstrate misconduct; and (3) during

21  deliberations Juror H had been separately questioned by the court and had told the judge she

22  "was okay with the verdict."  (RT 1395.)  The trial judge then asked petitioner's trial attorney for

23  his position on section 1150.  (RT 1396.)  In a rather confusing explanation, the trial attorney

24  _____

25         [4] All volumes of the Record of Transcript were lodged as document 9.  Hereafter,
    citations to the Record of Transcript will be identified by "RT" and the corresponding transcript
26  page number.

essentially stated that Juror H's declaration showed the effect of the prosecutorial misconduct at trial.  (Id.)  He never mentioned the other two arguments raised in his written motion: (1) that the jury considered a chart prepared by a juror outside the jury room; and (2) that the jury based its verdict on the misunderstanding that if petitioner was found insane, he would be out of custody within five years.  In fact, petitioner's trial counsel stated: "And at this point in time when we're dealing with prosecutorial misconduct, not misconduct of the jury . . . ."  (RT 1396.)

Respondent argues that trial counsel made a tactical choice to focus on the alleged prosecutorial misconduct, which was a better argument.  (Dkt. No. 63 at 19-21.)  He goes on to argue that the juror misconduct arguments would not have succeeded in any event because they were based on Juror H's declaration which was "largely inadmissible" under Evidence Code §1150.  (Id.)

This alleged ineffective assistance of counsel claim was raised in petitioner's 2001 habeas petition filed with the California Supreme Court.  (LD 14 at 24-30.)  The California Supreme Court denied the petition in a one-line, unexplained order.[5]  (LD 14.)  To determine whether a silent state court decision is objectively reasonable, this court must independently review the record.  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

Whether or not counsel acted reasonably is difficult to determine.  On the one hand, this court must presume reasonableness.  The Supreme Court recently noted that, "[t]here is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'"  Harrington, 131 S. Ct. at 790 (quoting

---

[5]  Petitioner raised the claim again in his second state habeas petition, which was brought before the superior court, the court of appeal, and the California Supreme Court.  The superior court denied the claim as untimely, among other grounds.  (LD 15.)  The appellate and supreme courts denied this second petition in one-line orders.  (LD 16, 17.)  The California Supreme Court original "postcard" denial of the petition is considered to be on the merits.  See Harrington, 131 S. Ct. at 784; Gaston v. Palmer, 417 F.3d 1030, 1038 (9th Cir. 2005) ("We construe 'postcard' denials . . . to be decisions on the merits."), modified on other grounds 447 F.3d 1165 (9th Cir. 2006).  Petitioner's subsequent attempts to raise this claim before the California courts does not create a procedural default issue here, and respondent does not argue one.

1  Yarborough v. Gentry, 540 U.S. 1, 8 (2003) (per curiam)).  On the other hand, the fact that trial

2  counsel raised the jury misconduct issues in his brief indicates he may have erred when he failed

3  to raise them in argument and, according to the Court of Appeal, waived them.[6]  (LD 12 at 21-

4  22.)  The record does not show that counsel considered his options and made a reasonable,

5  strategic decision.  See Strickland, 466 U.S. at 69.

6         In any event, whether or not the state court reasonably concluded counsel's

7  conduct was reasonable or unreasonable, petitioner has not shown the state court's conclusion

8  that he suffered no prejudice was unreasonable.  Petitioner was only prejudiced by counsel's

9  conduct if, had counsel preserved the jury misconduct claims, petitioner would have succeeded

10  on those claims before the state court.  As set out below, an analysis of each of those jury

11  misconduct claims shows no reasonable probability of success on the merits.

12                a. Jurors' Consideration of Petitioner's Sentence if Found Insane

13         The first issue is the jurors' consideration of petitioner's possible sentence if they

14  found him insane.  As petitioner points out, the jury was instructed not to consider what might

15  happen to petitioner should he be found insane.[7]

16         In considering the juror misconduct claims, the court is constrained by laws of

17  evidence limiting consideration of jurors' thought processes.  Under California Evidence Code §

18  1150:

19         (a) Upon an inquiry as to the validity of a verdict, any otherwise

20  ───────────────

21         [6]  The Court of Appeal recognized that there may be an ineffective assistance of counsel
    claim based on defense counsel's failure to argue the jury misconduct issues.  (LD 12 at 22 n.5.)
    However, the court refused to consider any ineffective assistance of counsel issue because it

22  "may reasonably be ascribed to factors which are outside the record" and therefore were not an
    appropriate consideration on appeal.  (Id.)

23

24         [7]  The instructions first informed the jury what generally happens upon a finding of
    insanity and then informed jurors: "What happens to the Defendant under these laws is not to be

25  considered by you in determining whether the Defendant was sane or not at the time he
    committed his crime. . . . .  If upon consideration of the evidence you believe the Defendant was
    insane . . ., you must assume that those officials . . . will not release this Defendant unless he can

26  be safely returned into society."  (RT 1342-43.)

1      admissible evidence may be received as to statements made, or
       conduct, conditions, or events occurring, either within or without
2      the jury room, of such a character as is likely to have influenced the
       verdict improperly. No evidence is admissible to show the effect of
3      such statement, conduct, condition, or event upon a juror either in
       influencing him to assent to or dissent from the verdict or
4      concerning the mental processes by which it was determined.

5      (b) Nothing in this code affects the law relating to the competence
       of a juror to give evidence to impeach or support a verdict.

6

7             Based on section 1150(a), the California courts would not have considered Juror

8      H's statements about the effects of the jurors' discussion of petitioner's possible sentence should

9      he be found insane.  However, it appears that section 1150(a) would allow consideration of Juror

10     H's statement that jurors discussed petitioner's possible sentence, particularly because jurors had

11     been specifically instructed not to discuss that issue.  See In re Stankewitz, 40 Cal. 3d 391, 397

12     (1985) ("Among the overt acts that are admissible and to which jurors are competent to testify

13     are statements.  Section 1150, subdivision (a), expressly allows proof of 'statements made ...

14     either within or without the jury room ....'"); People v. Perez, 4 Cal. App. 4th 893, 908 (1992)

15     ("[E]vidence of a jury's explicit or implicit agreement to violate a court's instruction does not

16     touch upon the juror's subjective reasoning processes, since, as in Stankewitz, such agreement in

17     and of itself constitutes misconduct.").  It appears, then, that under California law petitioner

18     could have shown the jurors' consideration of petitioner's possible sentence amounted to

19     misconduct.  The next question is whether that misconduct prejudiced petitioner.  Perez, 4 Cal.

20     App. 4th at 906.

21            After reviewing the testimony at trial regarding petitioner's mental health and

22     mental state at the time of the crimes, this court concludes that any jury misconduct did not

23     prejudice petitioner under California law.  To make the determination regarding petitioner's

24     insanity defense, the jury was instructed as follows:

25            If you find the Defendant guilty of any of the crimes
       charged, you must then determine whether he was legally sane or
26     legally insane at the time of the commission of the crime.

                                              13

1            You may consider evidence of his mental condition before, during, and after the time of the commission of the crime as

2    tending to show the defendant's mental condition at the time the crime was committed.

3

4            Mental illness and mental abnormality in whatever form either may appear, are not necessarily the same as legal insanity.

5            A person may be mentally ill or mentally abnormal and yet not be legally insane.

6

7            A person is legally insane when by reason of mental disease or mental defect he was incapable of knowing or understanding the nature and quality of his act, or incapable of distinguishing

8    between right from wrong at the time of the commission of the crime.

9

10           The Defendant has the burden of proving his legal insanity at the time of the commission of the crime by a preponderance of the evidence.

11

12           Preponderance of the evidence means evidence that has more convincing force than the greater probability of truth than that opposed to it.

13

14           If the evidence is so evenly balanced that you are unable to find that the evidence on either side of an issue preponderates, your finding on that issue must be against the party who had the burden

15    of proving it.

16  (RT 1341:21 - 42:20.)

17           Each side at trial presented the testimony of two mental health professionals

18  regarding petitioner's mental state.  In addition, both sides called the psychiatrist who had been

19  treating petitioner while he was incarcerated in juvenile hall.   Their testimony showed that

20  petitioner had been diagnosed with bipolar disorder and brain damage.  When he was thirteen

21  years old, petitioner was in a car accident that may have caused the brain damage.  During his

22  stay in juvenile hall and at a group home prior to the crimes, petitioner was medicated and

23  generally behaved better.  When petitioner left the group home less than a week before the

24  crimes, he was not taking his medication.  The experts agreed that at the time of the crimes

25  petitioner would have been suffering some withdrawal symptoms and/or some recurrence of his

26  bipolar disorder.  They disagreed about the effect those possible issues would have had on his

mental state.

The juvenile hall psychiatrist Dr. Diamond testified first for the defense.  He had treated petitioner for approximately one year when petitioner was detained at the Sacramento County Juvenile Hall.  (RT 618, 626.)  He testified to the medications petitioner took for bipolar disorder.  (RT 627-28.)  When he was medicated, petitioner seemed less depressed and less distressed.  (RT 636.)  On cross-examination, Dr. Diamond testified petitioner still had problems with other inmates even when he was medicated.  (RT 640.)

Next to testify was defense neuropsychologist Dr. Edwards.  (RT 757.)  Dr. Edwards reviewed many records of petitioner's educational and social background, medical records, and records from the institutions, including a group home, where petitioner lived.  (RT 768.)  Dr. Edwards testified extensively regarding petitioner's brain dysfunction, that he felt was possibly the result of a head injury from an automobile accident petitioner suffered when he was thirteen.  (RT 787-88.)  Petitioner had a borderline retarded IQ and memory deficits.  (RT 776, 779.)  Dr. Edwards testified that he felt the shooting was impulsive and unplanned.  (RT 815.)  He concluded that he considered petitioner insane at the time of the shootings because "he really did not know the nature of the act, nor that it was wrong when he fired the gun backward."  (RT 816, 873.)  He continued: "I think that if he had been medicated, that this incident that he's charged with probably would not have occurred."  (RT 866.)  Dr. Edwards did admit on cross-examination that he based his opinion on the facts petitioner told him, and related to the police during an interview three days after the crime, regarding petitioner's history and what occurred on the day of the crimes.  (RT 822, 874.)  According to petitioner's version of the events, which he related to Dr. Edwards, someone handed him a gun and told him to shoot, then petitioner shot over his shoulder without looking.  (RT 874.)

The final defense mental health expert was psychiatrist Dr. Bittle.  Dr. Bittle testified about tests showing abnormalities in petitioner's brain.  (RT 1011, 1013, 1019-20.)  He opined that these abnormalities could cause impulsivity and aggression.  (RT 1015.)  In addition,

1    Dr. Bittle testified that there is a high medical probability petitioner had bipolar disorder.  (RT

2    1024-25.)  When petitioner suddenly stopped taking his medications, he likely felt extremely

3    restless and out-of-control.  (RT 1041.)  Petitioner had also told officers he had not slept for

4    many days.  Dr. Bittle testified that sleep deprivation can bring on hallucinations.  (RT 1045.)

5    Dr. Bittle concluded that, on the day of the crimes, petitioner was "borderline psychotic" and

6    "behaviorally and cognitively out of control."  (RT 1047.)  Therefore, Dr. Bittle felt petitioner did

7    not then understand right from wrong and could not control his actions.  (RT 1047.)  Like Dr.

8    Edwards, Dr. Bittle admitted his opinion was based on petitioner's report that he impulsively

9    fired the gun over his shoulder without looking.  (RT 1098-1100.)  When confronted with the

10   testimony of an eye witnesses/victim that petitioner pointed and shot the gun while facing him,

11   Dr. Bittle admitted that this description made petitioner's actions less impulsive.  (Id.)  However,

12   he also testified that someone who is insane can do something intentional.  (RT 1122.)

13              The prosecution's case focused largely on the events on the day of and the day

14   after the crimes as reported by eyewitnesses and by petitioner's mother.  The prosecutor's first

15   expert was Dr. Schaffer a psychiatrist.  (RT 1179.)  Dr. Schaffer testified briefly and concluded

16   that his review of the records showed petitioner could distinguish right from wrong and

17   understood the nature of his actions on the day of the crime.  (RT 1188, 1190-93.)  Dr. Schaffer

18   was followed by psychologist Dr. Leek.  (RT 1207.)  Dr. Leek examined petitioner twice in mid-

19   1985.  (RT 1209-10.)  Dr. Leek recited the following facts based on his review of the records

20   and examinations of petitioner:  Petitioner suffered some brain damage from the automobile

21   accident when he was thirteen.  (RT 1212.)  Upon petitioner's release from the group home,

22   petitioner spent about two weeks at home, during which time he "was characterized as being

23   angry, mad, and irritable, and wanting to rob someone."  (Id.)  On the day of the crimes,

24   petitioner and his friends conducted two beer runs.  (Id.)  During the first beer run, petitioner shot

25   one person.  (Id.)  Petitioner's actions appeared "calculated" because, as reported by a witness, he

26   was standing by the car, turned to face the witness, and shot at him.  (RT 1214.)  During the

1   second beer run, petitioner shot up in the air because the store owner was a friend of one of

2   petitioner's friends.  (Id.)  Immediately after the crimes, petitioner "attempted to escape

3   detection.  He asked his mother to drive him some place else and hid out for a couple of days, all

4   of which indicated the capacity to form intention, to act on it, to know that he was doing

5   something he wasn't supposed to be doing, and attempting to cover his behavior."  (RT 1213.)

6          Dr. Leek concluded that petitioner's primary diagnosis would be antisocial

7   personality and that petitioner was sane and knew what he was doing on the day of the crimes.

8   (Id.)  Dr. Leek further testified that nothing in the materials he examined indicated that petitioner

9   was out of touch with reality on the day of the crimes.   (RT 1216.)  Dr. Leek testified that it was

10  not good practice to consider only the reporting of the defendant, rather than also considering the

11  reporting of eyewitnesses, when determining the facts.  (RT 1225.)

12         Two eyewitnesses testified.  The first was Kishor Patel, the clerk at Day's Market,

13  the site of the first robbery and the murder.  Mr. Patel testified that he ran outside after his co-

14  worker, the murder victim, came back into the store and told him "'He's got a gun.'"  (RT 328.)

15  As he exited the store, he saw the person who had taken beer from the store in the front seat of a

16  car and another "guy" bending down to back into the back seat of the car.  (RT 330, 331, 347.)

17  That guy was facing him, pointed a gun at him and then fired at least two shots as Mr. Patel

18  turned to run back into the store.  (RT 333, 335, 349.)

19         The second eyewitness testified about the robbery and shooting at La Tiendita.

20  Victor Barajas, the owner of the market, testified that two teenage Hispanic men took two

21  twelve-packs of beer out of his store.  (RT 363-64.)  He followed them outside.  (RT 365.)  The

22  two men got into the back seat of a car.  (RT 366.)  Mr. Barajas walked around to the back of the

23  car to see the license plate.  (Id.)  He then saw someone in the front passenger seat step partly out

24  of the car and point a gun at him.  (RT 366-67, 368.)  He heard a shot and ran behind a pillar in

25  front of the store.  (RT 367.)  He found a bullet near the door to his store about a foot from where

26  he had been standing.  (RT 370.)

1        Finally, it is important to note that petitioner's mother Cynthia Portillo also

2   testified. (RT 581.)  She testified that petitioner's behavior changed dramatically after the

3   automobile accident.  (RT 589-91.)  She did admit on cross-examination that the car he was in

4   during the accident had been stolen.  (RT 704–05.)  Petitioner seemed better, calmer after he had

5   been at the group home for a while and was regularly taking medication.  (RT 595-600.)  When

6   he was released from the group home in January 1994, the home did not send medication for

7   him.  (RT 602.)  After several days at home, petitioner was sleeping less, was restless, and was

8   not eating.  (RT 602, 604.)  On the day after the crimes, petitioner called Ms. Portillo to pick him

9   up from an apartment complex.  (RT 682.)  When she told him someone had seen one of

10  petitioner's friend's picture on television in a report on the murder and beer theft, petitioner told

11  her "'We're all in trouble."  (RT 682, 730.)  When they got home, petitioner told her, "'Mom,

12  just take me somewhere."  (RT 682.)  She then drove him to the Citrus Heights area and dropped

13  him off.  (RT 682.)   Ms. Portillo testified she did not recall telling officers that petitioner told

14  her "'somebody took some beer and somebody died,'" and "'It was just a little gun it was just a

15  .22.  How can a little gun kill someone?'"  (RT 733-34, 735.)   Officer Barton later testified at

16  trial that when he interviewed Ms. Portillo on January 27, 1994, she told him petitioner made

17  both statements.  (RT 1154-57.)  In addition, Ms. Portillo said she asked petitioner who had fired

18  the gun and he told her "'It doesn't matter, we're all in trouble."  (RT 1156.)

19        The testimony adduced at trial reasonably supports a conclusion that any jury

20  misconduct regarding the rejection of the insanity defense did not affect the verdict.  Petitioner's

21  participation in the events on the day of the crimes and his recognition of their wrongfulness the

22  following day certainly support a jury finding that petitioner was not insane on the day of the

23  crimes.  Petitioner has not shown a reasonable probability he would have succeeded on this jury

24  misconduct claim had counsel preserved it for appeal.

25  ////

26  ////

1              b. Juror's Homemade Chart

2              The second allegation of juror misconduct is that a juror made a chart at home that

3    he or she brought into the jury room.   According to Juror H, "[i]t was used to prove I was

4    violating the law by not voting that Mr. Sanchez was sane." (CT 4 at 908.)  Petitioner provides

5    no further information about the chart.  Under California law, the juror's conduct does not

6    necessarily constitute misconduct if it did not introduce extrinsic evidence into deliberations.

7    See People v. Collins, 49 Cal. 4th 175, 235-39 (2010) (not misconduct for juror to make a chart

8    regarding some of the evidence on his home computer and bring the information he obtained to

9    jury room during deliberations; no extrinsic evidence involved).  Petitioner has not shown that

10   the chart introduced extrinsic evidence into the jury room.  He has not shown that, had trial

11   counsel raised this jury misconduct issue, it likely would have been successful.

12             There is no reasonable probability petitioner was prejudiced by counsel's failure

13   to preserve the jury misconduct claims.  The decision of the state court denying petitioner's claim

14   of ineffective assistance of counsel is not contrary to, or an unreasonable application of, the law

15   nor is it based on an unreasonable determination of the facts.  Accordingly, petitioner's first

16   claim for relief (Ground One) based upon alleged ineffective assistance of counsel should fail.

17             3. Alleged Failure to Appropriately Argue the Insanity Defense (Ground Two)

18             Petitioner claims that in closing argument his trial counsel essentially abandoned

19   the defense that petitioner was either insane or lacked the mental ability to form the requisite

20   specific intent.  (Dkt. No. 58, attachment 12 at 3-9; Dkt. No. 72 at 59-63.)   In particular,

21   petitioner argues his counsel committed two errors: (a) turning over to the prosecution the issue

22   of petitioner's ability to form specific intent; and (b) admitting that he did not have "skill or

23   background" to argue the insanity issue so the jury would just have to figure it out. (Dkt. No. 72

24   at 60.)  Petitioner argues his counsel could have, and should have, made an attempt to

25   underscore the flaws in the prosecution's experts' testimony.  (Id. at 60-61.)

26   ////

1    Petitioner cites the following passages from the trial transcript to support his

2  argument that his counsel gave up the issue of specific intent:

3         Well, how can you talk about specific intent which is a
      mental process without looking at his mental disabilities, his lack
4     of sleep for a week plus, his bipolar and neurological problems,
      and this abrupt discontinuation of his medical treatment and these
5     subsequent states that he found himself in?  Because that is very
      relevant to he issue of his specific intent.

6
          What, if any, specific intent did he form to qualify him for
7     the felony murder theory?

8         Now, I am going to leave that more specifically to my client
      or my colleague, Mr. Swartz, to get into.

9

10  (RT 1259.)

11         He also points to the prosecutor's statement that he understood the defense to be

12  leaving the mental state issues for the prosecution to argue:

13         So the approach you need to take is, and the approach I
      want to take is, first look at his conduct in light of the law, and you
14    determine what, if anything, he's guilty of.

15         Once you do that, if you find him to be guilty of one or
      more charges, then you move onto the additional question of, was
16    he legally sane or insane at the time he committed these offenses?

17         So with that in mind, Mr. Castro didn't cover that, he left it
      to me, as he told you.  We need to cover the charges a little bit.

18

19  (RT 1290.)

20         With respect to petitioner's argument that defense counsel told the jury he lacked

21  the ability to argue the mental health issues, petitioner cites the following statements of defense

22  counsel during his discussion of Dr. Bittle's description of brain trauma resulting from an

23  impact:

24         Temporal lobes, the types of – what happens to verbal
      memory, visual ideas, sequences, difficulty in identifying memory
25    problems, I don't know what this is, but maybe our Doctor on the
      panel will be able to tell us.

26

20

1

> I find that interesting because it's something again, when
> you're trying to discuss things and understand them, sometimes
> resorting to things that speak for themselves is very helpful.

2

3

> You know, it's obvious that there's some kind of damage in
> there.  And it's – probably our technology is not at a level where it
> can be definitive, but it can give us some real strong suggestions.

4

5   (RT 1283-84.)  Defense counsel similarly professed a lack of understanding about technical

6   medical issues after summarizing the testimony of several of the experts regarding petitioner's

7   brain damage:

8

> So unfortunately I do not have the skill or the background
> to handle the medical technical stuff very well, so I will leave that
> to you.  I think that any contribution I would make to that would be
> more confusing than instructive.

9

10

11   . . .

> And there's also a consensus of opinion that he, among his
> professionals, that he's brain damaged.  But the question is, how
> much did this affect his ability to act in a rational manner?  That is
> the decision that you have to make.

12

13

14

> And I can't be of any further assistance to you, because as I
> said, I am just – that goes way beyond my depth.

15

16   (RT 1287-88.)

17   Petitioner raised this claim in his appeal.  The California Court of Appeal

18   addressed it on the merits.  (LD 12 at 16-19.)  The Court of Appeal pointed out that, rather than

19   conceding petitioner's sanity or abandoning the issue of specific intent, defense counsel:

20

> focused on the nuances of how the defendant could act
> intentionally but be legally insane, and in his rebuttal argument he
> continued to focus on the theme that the defendant was legally
> insane under the combination of circumstances present on the night
> of the crime.  Defense counsel could do no more with the cards
> dealt.  As for the disavowals of proficiency with which appellate
> counsel would tar defense counsel, these are no more than
> commonplace efforts to inculcate a sense of camaraderie with the
> lay jury regarding the psychiatric jargon so that jurors would side
> with the insanity defense, as well as a strategic emphasis of the
> complexities to push the jurors toward accepting his argument
> without delving too deeply into the experts' actual testimony.  In

21

22

23

24

25

26

21

1     short, nothing about defense counsel's final argument fell below
2     professional standards.

3  (Id. at 18-19.)

4          The statements upon which petitioner focuses are taken out of context.  Petitioner

5  focuses on statements made by counsel in his initial closing argument and ignores his counsel's

6  arguments in rebuttal.[8]  Almost the entire defense rebuttal argument was that petitioner was not

7  sane at the time of the shootings.  (RT 1316-27.)  Petitioner has not shown that the Court of

8  Appeal ruling that counsel acted reasonably is an unreasonable construction of Strickland or an

9  unreasonable application of the facts.  Accordingly, petitioner's Ground Two should fail as well.

10                  4.  Failure to Request Admonishment (Ground Three)

11          Petitioner next argues his trial counsel should have asked the trial judge to

12  admonish the jury not to consider statements made by the prosecutor and an expert witness that

13  the prosecutor's mental health experts were "court appointed."  (Dkt. No. 58, attachment 12 at

14  10.)  In her declaration, Juror H observed that "[t]he mental[] health professionals were in sharp

15  disagreement whether Mr. Sanchez was insane a[t] the time of the shootings.  Drs[.] Bittle and

16  Edwards testified that he was insane and Drs[.] Schafer and Leek testified that he was not

17  insane."  (CT 4 at 907.)  Juror H noted that "it was the near unanimous opinion" of the jurors that

18  psychiatrists Schafer and Leek "were credible because the[y] were 'court appointed'" and

19  therefore "had no[] ax to grind and were to be believed," while psychiatrists Bittle and Edwards

20  "were not appointed by the court so they were not credible" and therefore their "evidence was

21  ignored."  (Id.)

22          The California Court of Appeal addressed this claim in discussing petitioner's

23  wavier of his prosecutorial misconduct argument:

24  ////

25
26          [8]  Because petitioner's sanity was at issue, the defense made the first closing argument,
    followed by the prosecution argument and the defense rebuttal.

1
2
3
4

> At the hearing on the [new trial] motion, . . . [t]he prosecutor argued that any prejudicial effect could have been eliminated by an admonition. Defense counsel asserted his misgivings for failing to request an admonition, because he had believed at the time of the cited misconduct that it was better not to call further attention to this inadmissible matter. He felt in hindsight this amounted to ineffective assistance of counsel.

5  (LD 12 at 20.)

6       In a footnote, the Court went on to address that ineffective assistance of counsel

7  claim:

8
9
10
11

> We reject appellate counsel's effort to rest a claim of ineffective assistance on defense counsel's hindsight remorse. As even the trial court recognized, refraining from requesting an admonition was a reasonable tactical decision at that point in the trial to try to minimize the impact of this evidence. A defendant is guaranteed reasonable tactical choices, not guaranteed outcomes. As a result, this conduct cannot support a claim of ineffective assistance.

12  (LD 12 at 20 n.4 (internal citation omitted).)

13       The decision of the Court of Appeal was not an unreasonable application of

14  Strickland. First, petitioner has not shown his counsel's conduct was unreasonable. Defense

15  counsel himself said he consciously decided not to seek an admonition to avoid bringing

16  attention to the issue. (LD 12 at 20.) The fact that defense counsel later second-guessed this

17  decision is not relevant; the inquiry is whether the decision was objectively unreasonable.

18
19
20
21

> After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. Strickland, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind. 466 U.S. at 688.

22  Harrington, 131 S. Ct. at 790. Further, petitioner has not shown prejudice. Juror H's declaration

23  may not be considered because it involves neither extraneous information, an outside influence,

24  or a mistake on the verdict form. Fed. R. Evid. 606(b). Even if the jury been admonished,

25  petitioner has not shown the result would have been any different. As discussed above, the

26  record reasonably supports a finding that petitioner was sane and, for the same reasons, supports

1  a finding that petitioner acted with specific intent.  Therefore, Ground Three should be denied.

2       5.  Failure to Investigate and Present Mental Defenses and to Present Evidence of
           Third Party Confession (Grounds Eleven and Twelve)

3

4         Petitioner argues his trial counsel rendered ineffective assistance when he failed to

5  investigate and present evidence to support a mental defense and when he failed to seek to

6  introduce a tape recording in which a third party confessed to the shooting.  (Dkt. No. 58,

7  attachment 12 at 19, 20; Dkt. No. 72 at 51-63.)   Respondent briefly makes a procedural default

8  argument that he then dismisses because he feels he must show California's timeliness rule is

9  "consistent."  (Dkt. No. 63 at 36.)  Whether or not respondent is correct that he bears the burden

10  of showing consistency of the California rule, it appears that respondent has waived the

11  procedural default argument.  See Trest v. Cain, 522 U.S. 87, 89 (1997) (procedural default is not

12  jurisdictional and may be waived); Franklin v. Johnson, 290 F.3d 1223, 1230, 1233 (9th Cir.

13  2002).  In any event, because petitioner does not succeed on the merits of these claims, the court

14  need not reach any procedural default arguments.  See Lambrix v. Singletary, 520 U.S. 518, 525

15  (1997) (a district court may address the merits without reaching procedural issues where the

16  interests of judicial economy are best served by doing so); Franklin v. Johnson, 290 F.3d 1223,

17  1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits

18  issues presented by the appeal, so it may well make sense in some instances to proceed to the

19  merits if the result will be the same.").

20         Petitioner makes few arguments relevant to these claims.  The petition contains a

21  very brief description of Grounds Eleven and Twelve.  (Dkt. No. 58 at 19, 20.)  Petitioner's

22  Reply to the Answer focuses primarily on trial counsel's closing arguments and an overview of

23  the mental health evidence presented at trial.  (Dkt. No. 72 at 51-63.)  Petitioner does not argue

24  just what trial counsel should have done.  Instead, he primarily bases his argument on his

25  assertion that trial counsel erred with respect to the mental health defenses by pointing to a

26  couple places in the record in which counsel admits to the court that he did not have the

experience to present adequately the mental health case.  First, counsel admitted to the trial court

that he did not have the ability to adequately "present or defend an insanity/mental defense type

case."[9]  Second, during the presentation of medical testimony at the suppression hearing, the trial

judge pointed out to defense counsel that his expert witness had already explained a certain type

of test.  Defense counsel replied: "I think the Court has greater experience at this than I do, and

basically, I am going from the script that I have worked up to help me get through it because I am

technically not real good at the psychology and psychiatry of this issue."  (RT 166.)   The trial

judge responded, "I don't think this is the time for your education, Mr. Castro."  (RT 166.)

Finally, apparently the trial court held a Marsden hearing after the verdict.  While petitioner cites

to the transcript of that hearing, the transcript is sealed and this court does not appear to have a

copy of the sealed transcript.  (RT 1393 - reporter's note in transcript states: "(Pgs. 1393-1394)/

sealed/ nothing omitted.")  For purposes of analyzing these claims, the court will accept

petitioner's representation that during the brief Marsden hearing, petitioner requested another

attorney based on his trial attorney's "inexperience in handling a sanity defense."  Petitioner

made the request after the verdict because counsel "had 'never handled an insanity case and was

supposedly taking night classes on insanity cases while representing' Petitioner," and defense

counsel "did not deny those assertions, but thought it was too late to make a difference."  (Dkt.

No. 72 at 62.)

        Petitioner raised these claims in his second state habeas petition before the

superior court, court of appeal, and California Supreme Court.  (LD 15 at 3; LD 16 at consecutive

pp. 5-6; LD 17 at consec. pp. 5-6.)  The superior court's opinion on the merits of these claims is

the last reasoned opinion of the state court.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04

(1991).  Petitioner has not shown that the state court's opinion was an unreasonable construction

of the law or an unreasonable application of the facts.  Petitioner has not shown what counsel

---

[9]  While petitioner quotes this in his petition, it is not clear where in the record it occurred.

1    should have done to better support the mental health defenses.  This court's review of the record

2    shows extensive testimony and more than adequate questioning of both petitioner's experts and

3    the prosecution experts.  Petitioner's conclusory allegations of unreasonable conduct on his trial

4    counsel's part are insufficient to carry his burden under <u>Strickland</u>.  Accordingly, Grounds

5    Eleven and Twelve should be denied.

6         B.  <u>Alleged Juror Misconduct (Ground Four)</u>

7              Petitioner argues that the facts discussed above in his first ineffective assistance of

8    counsel claim show juror misconduct that violated his rights to due process.  (Dkt. No. 58,

9    attachment 12 at 11.)   Petitioner raised the jury misconduct issue on direct appeal to the

10   California Court of Appeal (LD 12) and in his Petition for Review in the California Supreme

11   Court (LD 13).  The California Court of Appeal decision was the last reasoned opinion, and it is

12   presumed that the  California Supreme Court rejected petitioner's claim for the reasons addressed

13   therein.  <u>Ylst</u>, 501 U.S. at 803-04.  The Court of Appeal denied the claim on the ground that

14   petitioner's trial counsel failed to preserve it by failing to raise it in argument on the new trial

15   motion.  (LD 12 at 22.)  Respondent argues that petitioner has procedurally defaulted this claim.

16   This court need not reach the procedural default issue because, as discussed above, petitioner

17   cannot prevail on the merits of his juror misconduct claims.  Accordingly, this claim also should

18   be denied.

19        C.  <u>Alleged Prosecutorial Misconduct (Ground Five)</u>

20             Petitioner argues that the prosecutor committed misconduct when he told the jury

21   that petitioner's mental health experts were "court appointed."  (Dkt. No. 58, attachment 12 at

22   12.)  As described above with respect to Ground Three, any misconduct in the introduction of

23   this information did not prejudice petitioner.  Moreover, the prosecutor's conduct was harmless

24   because petitioner's own trial expert also referred to the state's experts as having been "court-

25   appointed."  (RT 768.)  Therefore, Ground Five should be denied.

26   ////

1     D.  <u>Admission of Gang Evidence (Ground Six)</u>

2         Petitioner next argues the trial court erred when it permitted evidence of

3 petitioner's affiliation with a criminal street gang.  (Dkt. No. 58, attachment 12 at 13-14.)  The

4 trial court granted petitioner's pre-trial motion to bar gang evidence.  (RT 10-11.)  During the

5 course of trial, the prosecutor asked the court to reconsider.  Petitioner argues the trial judge

6 agreed to allow the gang evidence based on defense witness Dr. Edwards' one, unsolicited

7 statement that mentioned petitioner's gang affiliation.  (Dkt. No. 58, attachment 12 at 13-14.)

8 Because the state court's decision was not unreasonable, this court recommends denial of Ground

9 6 for the reasons set forth below.

10         Petitioner raised this issue on appeal.  It was addressed, and rejected, by the Court

11 of Appeal as follows:

> At the outset of trial, the superior court rejected the
> prosecution's theory for admission of evidence of the defendant's
> gang affiliation - the choice of Day's Market was its location in
> rival gang territory - because it found this marginally probative (in
> the absence of any other evidence of the gang-related nature of the
> offenses) in light of the potential for prejudice. It agreed to
> reconsider the matter as the case developed. During the course of
> the defense case, the prosecutor asked the court to reconsider its
> ruling based on the tenor of defense counsel's examination. The
> prosecutor asserted the defense appeared to be developing a theory
> that the defendant became a juvenile delinquent as a result of the
> 1990 car accident, so the gang evidence was now relevant to rebut
> this theory by providing an alternative basis for the defendant's
> behavior. The court deferred ruling on the matter until it had the
> opportunity to observe the progress of the defense.
>
> During the subsequent examination of a psychiatric expert,
> defense counsel asked him to relate the defendant's history. In the
> course of his narrative answer, the expert described the
> deterioration in the defendant's behavior after the accident to the
> point where his mother "found him to be uncontrollable. [¶] He
> was involved in gang activities and was not coming home, not
> being obedient . . . and she asked the Probation Department to take
> charge of him, and that's when he was put in a group home . . . [¶]
> At that group home, he was a behavior problem . . . . [¶] After he
> got on the  medication, he seemed to be improving. He was still a
> problem . . . but the number of infractions went down and the types
> of infractions . . . seemed to . . . become more benign . . . ."

1        During a conference in chambers, the superior court decided this tangential reference to the defendant's gang membership opened the subject for further questioning by the prosecutor, even though defense counsel asserted he had not moved to strike the testimony based on the sensible tactic of not wishing to draw further attention to it. The court thus allowed the prosecutor to ask the expert if the defendant's gang affiliation could have been a basis for the deterioration in the defendant's behavior, and if the defendant's record showed involvement in gang activity before the car accident (both of which the expert conceded). The prosecutor also introduced rebuttal evidence from members of the police department's street-gang unit, who testified to the gang membership of the defendant and other occupants of the car, and from psychiatric experts who believed his commission of the offenses in the company of fellow gang members was an indication of purposeful antisocial behavior rather than irrationality. The prosecutor cited this testimony in his final argument, asserting the offenses were not unusual behavior for gang members (and thus not evidence of the defendant's insanity) and the defendant's association with gangs preceded his accident.

        The defendant claims this evidence was not materially probative on any contested issue at trial, and thus the superior court should have continued to exclude it as prejudicial. However, in arguing this was reversible error, the defendant acknowledges this evidence was used to challenge the defense's claim of legal insanity which rested in part on brain injuries from the 1990 accident. The defendant does not provide any cogent reason to show the two theories articulated by the prosecutor in closing argument are invalid use of gang evidence. We thus find the superior court did not abuse its discretion in admitting this evidence.

(LD 12 at 9-11.)

        "The admission of 'other acts' evidence will violate due process only when there are no permissible inferences the jury may draw from the evidence." Windham v. Merkle, 163 F.3d 1092, 1103 (9th Cir. 1998) (emphasis in original) (internal quotations and citations omitted). See also Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991) (same). Here, the prosecutor argued that he should be permitted to use gang evidence to rebut the defense argument that the automobile accident caused petitioner's anti-social behavior. (RT 759-63.) The argument that petitioner's mental problems and criminal behavior were a direct result of the automobile accident was a key part of the insanity defense. Evidence that petitioner was

1   involved in gang activity, including prior to his motor vehicle accident, was relevant to rebut the

2   defense case.  Petitioner has not shown there were no permissible inferences the jury could draw

3   from the gang evidence.  It was not unreasonable for the state court to find the evidence

4   admissible.  See United States v. Abel, 469 U.S. 45, 49 (1984) (deciding that gang membership

5   was "sufficiently probative of ... possible bias ... to warrant its admission into evidence"); United

6   States v. Santiago, 46 F.3d 885, 889 (9th Cir. 1995) (recognizing that gang evidence is

7   admissible as proof of motive); Nguyen v. Runnels, No. C03-0689CRB, 2003 WL 22939239, *6

8   (N.D. Cal. Dec. 5, 2003) (evidence of gang affiliation admitted at petitioner's murder trial did not

9   violate due process because the jury could draw a permissible inference from the evidence with

10  respect to motive and intent); see also Aguilar v. Alexander, 125 F.3d 815, 820 (9th Cir. 1997)

11  (in a murder prosecution, evidence of petitioner's involvement in drug dealing was properly

12  admitted as relevant to his motive in connection with the killing).  The Court of Appeal decision

13  on this issue was not contrary to or an unreasonable application of federal law.  Accordingly,

14  petitioner is not entitled to relief on Ground Six in his petition.

15        E.   Robbery Jury Instructions (Grounds Seven and Eight) and Sufficiency of the Evidence
             (Ground Ten)
16

17        In Grounds Seven and Eight, petitioner contends the jury was not adequately

18  instructed on the elements of robbery, and that the trial court erred when it refused to give a

19  lesser included offense instruction.  (Dkt. No. 58, attachment 12 at 15, 16.)   In Ground Ten,

20  petitioner argues the evidence introduced at trial was insufficient to prove: (1)  he intended to aid

21  and abet a robbery; or (2) the special circumstance that the robbery was accomplished by force or

22  fear.  (Dkt. No. 58, attachment 12 at 18.)  Because petitioner has not established the decision of

23  the California Court of Appeal was contrary to, or an unreasonable application of, federal law, or

24  an unreasonable construction of the facts, Grounds Seven, Eight, and Ten should be denied.

25  ////

26  ////

The California Court of Appeal ruled on these issues as follows:

As we have related above, the clerk of the Day's Market testified that as he went outside, the defendant was still standing on the sidewalk and was just getting into the car when he began shooting at him. The purloined 12-packs were on the sidewalk about 10 feet from the door. According to defendant's custodial statement, Garcia told him to shoot as he jumped in the car; the defendant fired backward as they were driving away. He was completely unaware when Garcia had dropped the beer, noticing only once they were in the car that "he didn't have no damn beer in his hands." Later, as the interviewer confirmed the defendant's account, the defendant speculated Garcia dropped the beer as he was coming out of the store.

In People v. Cooper (1991) 53 Cal.3d 1158, the Supreme Court held that derivative liability for a robbery could be premised on assistance or encouragement at any point during the escape to a place of temporary safety with the stolen goods. (Id. at p. 1161.) Although not presented by the facts in Cooper, the court took pains to circumscribe this derivative liability, stating the robbery continued during the escape only so long as the direct perpetrator continued to transport the stolen goods. (Id. at p. 1170.)

The defendant relies on Cooper to make three different arguments. He first claims the evidence is insufficient to show that during his escape Garcia still had the stolen beer in his possession when the defendant provided the force necessary to elevate Garcia's theft into a robbery. He then claims that under a plausible interpretation of the facts, Garcia dropped the stolen beer in the course of his escape before the defendant fired the shot, thus the superior court should have charged the jury with his proposed instructions on the lesser-included offense of theft.

We reject the claim of insufficient evidence out of hand. No eyewitness of the fatal shooting testified at trial. The jury was not required to accept the defendant's self-serving custodial statement, which suffered both internal inconsistencies and inconsistencies with the surviving clerk's account. Even if we accept the relevance of Cooper's holding, a reasonable jury could conclude, based on the location of the beer ten feet from the store's entry, that the defendant had fired at the first clerk before Garcia dropped the beer.

More importantly, the superior court correctly relied on Pham in finding Cooper inapposite. (Estes is not instructive, as defendant Estes was still in possession of the stolen goods when he made a show of force (147 Cal.App.3d at pp. 27-28)). Defendant Pham had dropped the stolen property just before the owner grabbed him and defendant Pham began to resist forcibly. (15 Cal.App.4th at p. 64.) The court held it was not essential for

30

defendant Pham to be in actual possession of the stolen goods when making a show of force if the show of force prevents the owner from regaining possession of items in near proximity. (Id. at pp. 66-67.) In the present case, the escape with the beer, the dropping of the beer, and the shooting at the hotly pursuing owner of the beer all occurred contemporaneously, thus Pham renders the exact coordination of the dropping and the shooting irrelevant, because it was a robbery nevertheless. The efforts to parse the events into a series of frozen instances to pursue a less-culpable state of mind for the defendant's wanton misconduct is not well taken. (Estes, supra, 147 Cal.App.3d at p. 28.)

(LD 12 at 11-13 (footnote omitted).)

1. Jury Instructions

Petitioner's claims relative to the jury instructions are: (a) that the jury instructions did not inform the jury of the applicable force requirement because the jury could have found the property was abandoned before any force was used; and (b) that the trial judge erred in refusing to give a lesser included offense instruction.   (Dkt. No. 58, attachment 12 at 15, 16.)

A state court's determination that a requested jury instruction is not allowed under state law cannot form the basis for federal habeas relief.  Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  See also Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005) (same). Accordingly, the decision of the California Court of Appeal that petitioner had no right under state law to a jury instruction is binding on this court.  See Waddington v. Sarausad, 555 U.S. 179, 129 S. Ct. 823, 832  n.5 (2009) ("we have repeatedly held that 'it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions'") (quoting Estelle, 502 U.S. at 67-68); Bradshaw v. Richey, 546 U.S. 74, 76 (2005) "a state court's interpretation of state law . . . binds a federal court sitting in federal habeas").

Similarly, petitioner does not have a federal constitutional right to an instruction on a lesser included offense.  See Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) ("[T]he failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."); Solis v. Garcia, 219 F.3d 922, 929 (9th Cir.

31

2000) (habeas relief for failure to instruct on lesser included offense in non-capital case barred by Teague v. Lane, 489 U.S. 28 (1989), because it would require the application of a new constitutional rule). Petitioner makes an argument that due process requires a state court to provide adequate jury instructions on a defendant's theory of defense. (Dkt. No. 72-1 at 38.)   It is true that the Ninth Circuit Court of Appeals in Solis recognized this might be an exception to the general rule barring federal court consideration of a state court's refusal to instruct on a lesser included offense. Solis, 219 F.3d at 929.  However, even if petitioner does possess that right, the state court's conclusion that state law did not require and the evidence did not warrant such an instruction was not objectively unreasonable.  The California Court of Appeal explained that under California law the rapid series of events surrounding the shooting amounted to a robbery regardless of precisely when Garcia dropped the beer.  (LD 12 at 13.)  Due process does not require an instruction that is not supported by state law in this circumstance.

Thus, petitioner can only succeed on a jury instruction challenge if he can show the alleged error "so infect[ed] the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 672 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)); see also Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988).

Petitioner has cited no authority for the proposition that his due process rights were somehow violated by the trial court's refusal to give an instruction regarding aiding and abetting or a lesser included offense instruction.  As the Court of Appeal pointed out, the jury was not required to accept petitioner's construction of the facts presented at trial, which are based largely on his own self-serving statements.  Accordingly, the state court's rejection of petitioner's claim was not contrary to, or an unreasonable application of, clearly established federal law.  See Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004) ("If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly

1  established federal law").

2          2.  Alleged Insufficiency of the Evidence

3          The Due Process Clause of the Fourteenth Amendment "protects the accused

4  against conviction except upon proof beyond a reasonable doubt of every fact necessary to

5  constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  There

6  is sufficient evidence to support a conviction if, "after viewing the evidence in the light most

7  favorable to the prosecution, any rational trier of fact could have found the essential elements of

8  the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "[T]he

9  dispositive question under Jackson is 'whether the record evidence could reasonably support a

10  finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir.

11  2004) (quoting Jackson, 443 U.S. at 318).  "A petitioner for a federal writ of habeas corpus faces

12  a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction

13  on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In

14  order to grant the writ, the federal habeas court must find that the decision of the state court

15  reflected an objectively unreasonable application of Jackson and Winship to the facts of the case.

16  Id. at 1275 & n.13.

17          Viewing the evidence in the light most favorable to the verdict, the undersigned

18  concludes that there was sufficient evidence introduced at petitioner's trial from which a rational

19  trier of fact could have found beyond a reasonable doubt that petitioner intended to aid and abet a

20  robbery and that the robbery was accomplished by force or fear.  The evidence, as summarized by

21  the Court of Appeal and set forth above, fully supports the jury's finding that petitioner intended

22  to aid the robbery and intended to use force to do so.  The state courts' denial of habeas relief

23  with respect to petitioner's insufficient evidence claim is not an objectively unreasonable

24  application of Jackson and Winship to the facts of the case.  Accordingly, petitioner is not

25  entitled to federal habeas relief with respect to Ground Ten.

26  ////

F.  <u>Alleged Miranda Violation (Ground Nine)</u>

Petitioner argues the introduction of statements given to law enforcement officers violated his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), because he did not voluntarily, knowingly, and intelligently waive his <u>Miranda</u> rights.  (Dkt. No. 58, attachment 12 at 17.)  As described below, the state court's rejection of this claim was not error.

The Court of Appeal considered and rejected this claim as follows:

At the outset of the defendant's interrogation, he and the detective had the following exchange:

"But I can't talk to you at all unless we do the next thing. So the next thing is . . . the advising of your rights . . . .You do have the right to remain silent.  Anything you say can and will be used against you in a court of law.  You have the right to talk to an attorney and have an attorney present before and during questioning. If you cannot afford an attorney, one will be appointed free of charge to represent you before and during questioning, if you desire. Do you understand those rights?
" [DEFENDANT]: Uh-huh.
" [DETECTIVE]: Okay. . . . So you do understand your rights?
" [DEFENDANT]: Yeah.
"[DETECTIVE]: Okay. Having your rights in mind, do you wish to waive them and to talk to me?
"[DEFENDANT]: **What do you mean?**
"[DETECTIVE]: Well, in other words, these -- the rights I just explained to you, uh, 'You have the right to remain silent.' That means that you don't have to talk to me if you don't --
"[DEFENDANT]: I'll talk to you.
"[DETECTIVE]: -- want to. You want to talk to me? Okay. Without an attorney?
"[DEFENDANT]: I don't have an attorney.
"[DETECTIVE]: My . . . I know you don't have an attorney right now.
"[DEFENDANT]: It don't matter to me.
"[DETECTIVE]: Okay. Well, so you want to talk now?
"[DEFENDANT]: [No audible response]
"[DETECTIVE]: Okay. . . . I have to ask you to say 'yes' if you want to talk, --
"[DEFENDANT]: Yeah.
(Emphasis supplied.)

At the hearing on the defendant's motion to suppress the custodial statement which followed, he stipulated that in three previous arrests, police officers had advised him of his rights under <u>Miranda</u>. The record showed he was just shy of 17 years old at the time of the offenses; he nonetheless had six prior arrests and had

been on juvenile probation since the age of 13. The defendant presented testimony from three psychiatric witnesses who had examined him. We need not relate the substance of this testimony, as the superior court found in its ruling on the motion that "[t]he record before me now discloses the uncontroverted evidence that Mr. Sanchez suffers from some organic brain disorder, possibly secondary to [an] automobile accident, or additionally some bipolar disorder . . . which may be hereditary or subject to [sic] . . . substance abuse or the like; but in any event, he has demonstrable evidence of some brain dysfunction." The defendant also presented testimony from his mother and a house mate that he had suffered brain injuries in a 1990 accident (at the age of 13) while a passenger in a stolen car fleeing from the police, that his behavior and functioning deteriorated thereafter, that he seemed much better when under medication at a group home, that when he came home 10 days before the shootings the group home did not send his medications, and that he had stopped eating and sleeping days before his interrogation.

Although the defendant acknowledges <u>Miranda</u> and its progeny do not require an explicit waiver, in an exercise of formalism he focuses on the response we emphasized in the above passage as conclusive evidence he neither expressly nor by implication waived his privileges under <u>Miranda</u>. We disagree. The context of the question indicates the defendant was well aware of his <u>Miranda</u> privileges, and was merely uncertain about what the detective had asked; once he realized the detective wanted him to consent to questioning, he expressed no reluctance whatsoever. In the context of <u>Miranda</u>, actions speak louder than words.

In the alternative, the defendant argues the evidence shows he lacked capacity to make a knowing and intelligent waiver of his <u>Miranda</u> privileges. In assessing the record, we defer to the superior court's express and implied resolutions of disputed facts, including credibility. The superior court, taking into account the mental impediments of the defendant and his lack of sleep, found the defendant had been in the same position several times previously and was well aware both that the detective was an adverse party ("[i]ndeed, he always had the feeling the police were out to get him") and that any statement could have adverse results. We concur with the trial court; nothing in the record shows as a matter of law that the defendant's level of cognitive functioning was so diminished at the time of his interview that he was unable to protect his self-interest. Rather, he already had years of experience with the police, his statement and his mother's testimony demonstrated he was keenly aware of the seriousness of his situation, and he had taken measures to avoid capture. We thus reject this argument. (<u>People v. Lara</u> (1967) 67 Cal.2d 365, 377-378, 383, 385-87 [age and cognitive ability are among factors to consider but not determinative; courts have found valid waiver with mental age as young as 7; thus, criminally experienced

35

1      18-year-old with IQ of 65-71 had capacity to waive <u>Miranda</u>
2      protections].)

3  (LD 12 at 5-8 (some internal citations omitted).)

4          In <u>Miranda</u>, the United States Supreme Court held that "[t]he prosecution may not

5  use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the

6  defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege

7  against self-incrimination."  384 U.S. at 444.  To this end, custodial interrogation must be

8  preceded by advice to the potential defendant that he or she has the right to consult with a lawyer,

9  the right to remain silent and that anything stated can be used in evidence against him or her.  <u>Id.</u>

10  at 473-74.  These procedural requirements are designed "to protect people against the coercive

11  nature of custodial interrogations."  <u>DeWeaver v. Runnels</u>, 556 F.3d 995, 1000 (9th Cir. 2009).

12  Once <u>Miranda</u> warnings have been given, if a suspect makes a clear and unambiguous statement

13  invoking his constitutional rights, "all questioning must cease."  <u>Smith v. Illinois</u>  469 U.S. 91,

14  98 (1984).  <u>See</u> <u>also</u> <u>Miranda</u>, 384 U.S. at 473-74; <u>Michigan v. Mosley</u>, 423 U.S. 96, 100 (1975);

15  <u>DeWeaver</u>, 556 F.3d at 1001.

16          A defendant may waive his <u>Miranda</u> rights, provided the waiver is "voluntary in

17  the sense that it was the product of a free and deliberate choice rather than intimidation, coercion,

18  or deception," and "made with a full awareness of both the nature of the right being abandoned

19  and the consequences of the decision to abandon it."  <u>Moran v. Burbine</u>, 475 U.S. 412, 421

20  (1986).  However, an express waiver of <u>Miranda</u> rights is not necessary.  <u>Berghuis v. Thompkins</u>,

21  130 S. Ct. 2250, 2261 (2010); <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979); <u>United States</u>

22  <u>v. Younger</u>, 398 F.3d 1179, 1185 (9th Cir. 2005) ("In soliciting a waiver of <u>Miranda</u> rights,

23  police officers need not use a waiver form nor ask explicitly whether a defendant intends to

24  waive his or her rights.").  A valid waiver of rights may be implied under the circumstances

25  presented in the particular case.  Specifically, "a suspect may impliedly waive the rights by

26  answering an officer's questions after receiving <u>Miranda</u> warnings."  <u>United States v. Rodriguez</u>,

1   518 F.3d 1072, 1080 (9th Cir. 2008) (quoting United States v. Rodriguez-Preciado, 399 F.3d

2   1118, 1127, amended, 416 F.3d 939 (9th Cir. 2005)).  See also Butler, 441 U.S. at 369-73

3   (waiver of Miranda rights can be inferred "from the actions and words of the person

4   interrogated").

5           Petitioner argues the decisions of the trial court and Court of Appeal were based

6   on an unreasonable determination of the facts.  After reviewing the transcript of the suppression

7   hearing and the transcript of petitioner's interview with Officer Overton, this court concludes the

8   state courts' determinations were not unreasonable.  (RT 1-275; LD 3 at 59-121.)  Drs. Diamond,

9   Edwards, and Bittle testified at the suppression hearing regarding petitioner's mental health

10  problems, intellectual capabilities, and brain injury and the likely impacts of the withdrawal of

11  petitioner's medications and his lack of sleep.  (RT 17-59; 138–211; 224-70.)  In addition,

12  petitioner's mother testified about his behavior after the automobile accident and around the time

13  of the crimes.  (RT 81-132.)  Josette Venegas, who lived with petitioner's family, testified about

14  petitioner's behavior when he came back from the group home.  (RT 59-81.)  The trial judge

15  found petitioner knowingly and voluntarily waived his Miranda rights.  (RT 271-75.)   As

16  described above, the Court of Appeal held petitioner's question "What do you mean?" was not

17  necessarily an indication he did not understand his Miranda rights and a number of factors

18  showed petitioner's mental functioning was not so low that he could not understand his rights.

19          Petitioner waived his Miranda rights at the commencement of the interrogation

20  when, after receiving the appropriate warnings and being told that the officers wanted to talk to

21  him about the events surrounding the crimes, petitioner agreed to answer the officer's questions.

22  See Berghuis, 130 S. Ct. at 2261 (noting that a waiver of Miranda rights may be implied through

23  the defendant's silence, along with an understanding of those rights and a course of conduct

24  indicating waiver) (citing Butler, 441 U.S. at 373).  When asked if he understood his rights,

25  petitioner replied that he did.  (LD 12 at 6.)  The state courts appropriately considered the

26  evidence put on by petitioner at the suppression hearing, but also petitioner's experience with the

police and understanding of the seriousness of his actions as evidenced by statements made to his mother after the crimes and his attempts to evade arrest.  In Fare v. Michael C., 442 U.S. 707, 725 (1979), the Court held that determining whether Miranda rights have been waived "includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights."  In Fare, as here, the Court recognized that an older juvenile with "considerable experience with the police" could very well knowingly waive his rights.  Id. at 726.  There is nothing in the responses given by petitioner to the officers' Miranda warning or otherwise to indicate that he did not understand his constitutional rights as explained to him or that he wished to invoke his rights to counsel and to remain silent.  Further, petitioner appeared to understand all of the officers' questions and his answers were coherent and intelligible, notwithstanding his mental problems and lack of sleep.  Petitioner's claim that he did not knowingly and voluntarily waive his Miranda rights should be denied.

CONCLUSION

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3). Any response to the objections shall be filed and served within fourteen days after

1  service of the objections.  The parties are advised that failure to file objections within the

2  specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951

3  F.2d 1153 (9th Cir. 1991).

4  DATED:  March 18, 2011

5

6                                              _____

7                                              KENDALL J. NEWMAN
                                               UNITED STATES MAGISTRATE JUDGE

8  sanchez 1694.hc

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26